## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

MICHAEL ROMERO,                    )
                                   )
                    Plaintiff,     )
                                   )
v.                                 )          Case No. 12-CV-346-JED-PJC
                                   )
THE CITY OF MIAMI, et al.,         )
                                   )
                                   )
                    Defendants.    )

## OPINION AND ORDER

Plaintiff Michael Romero brought this civil rights action against his former employer, the City of Miami, Oklahoma, several of its officers, and two other municipal entities.  Romero, the City's former Chief Financial Officer, claims that he was forced to undergo an unconstitutional drug and alcohol screening and then was unlawfully fired when he raised questions about its propriety.   A number of the defendants seek dismissal of some or all of his claims against them (*see* Docs. 36 and 38), which the Court will now address.

### BACKGROUND

During Romero's time as CFO of the City of Miami, the City's Personnel Policy Manual contained a policy under which any of the City's employees could be forced to undergo random drug and alcohol testing without regard to individualized suspicion.  On August 15, 2011, shortly after being named CFO, Romero was notified by defendant Nancy Wells, the City's Human Resource Director, that he had been selected for a random drug and alcohol screening and that he was to report to the testing site immediately.

The City's drug testing was typically conducted by defendant Municipal Electric Systems of Oklahoma ("MESO"), an association of municipally-owned electric utilities that provides,

among other things, municipal training in the areas of drug testing and safety.  Romero's test was conducted by an employee of defendant Oklahoma Municipal Utility Services Authority ("OMUSA"), which is a public trust created by MESO that utilizes MESO employees on a contract basis to provide services to municipalities.  When Romero reported to the testing site, defendant Mark Hill, the City's Risk Control Manager, and a female OMUSA representative were present.  Romero was required to show his identification, and submit to a breathalyzer test and provide a urine sample.  Romero's First Amended Complaint ("FAC") states that, as the City's CFO, Romero expressed concern to the OMUSA representative that he was being required to undergo testing.  Romero further states that he submitted to the testing in order to comply with the City's policy, which would have required that he be terminated had he refused the tests.

Following the testing, Romero promptly notified Wells, Hill, defendant David Anderson, the City Attorney, and Tim Wilson, the City's acting City Manager, that he believed that the test administered to him was illegal and in violation of his civil rights because he was not in a safety or security sensitive position and no individualized suspicion had been identified.  Romero alleges that Wells, Hill, Anderson, and Wilson all possessed responsibility for the continued operation of the City's testing policy.  Romero was told by Wilson "not to bother" Wells about the test and was informed that a fire department employee had tested positive for marijuana but that the City did not plan to pursue action against the employee in order to comply with the law.  On August 23, 2011, Romero again inquired of Wells and expressed his intention that the City change its drug testing policy going forward to comply with the law.  On August 30, Romero once again inquired of Wells, who then forwarded the inquiry to Anderson and Wilson on September 7, 2011.

Romero also alleges that, aside from the drug and alcohol screening, he brought a second issue to the attention of the City.  Specifically, he states that in August and September of 2011, citizens began to raise concerns with City officials that contractors were not meeting specifications on street improvements which were underway.  Romero investigated the matter and determined that no public construction contracts had been executed and reported to the City Council and other officials, as required under Oklahoma law, for contracts exceeding $50,000. On September 6, 2011, Romero reported his concerns regarding the absence of public construction contracts for the street improvements to City Attorney Anderson.  Romero alleges that, as the City's CFO, he had a contractual duty to ensure that financial operations such as the street repair were carried out in compliance with applicable law.

On September 13, 2011, City Manager Wilson notified Romero in writing that, upon the advice of City Attorney Anderson, Romero was no longer authorized to have direct dealings with the administrative departments or staff, except on a "case-by-case basis." (Doc. 33, at 11). Romero further alleges that Wells and Wilson instructed various City employees not to speak to Romero.  On September 19, 2011, City Mayor Kent Ketcher made a written inquiry into Romero's job performance—the first such inquiry ever made as to Romero's performance as the City's CFO.  Romero responded to Ketcher's inquiry and copied the entire City Council, which members included defendants Rudy Schultz, Scott Trussler, Terry Atkinson, and John Dalgarn, discussing the problems that the City was having with its finance and accounting department. Romero requested in this response that the City Council enter an executive session to discuss any disagreements.  The City Council did not proceed with the requested executive session.  Instead, on September 23, 2011, Romero went to his office to discover that the lock had been changed. No formal action had been taken by the City against Romero at that time.

3

On September 27, 2011, the City's Information Technology Director, Michael Richardson, informed Romero that his work computer was being "searched" by Richardson and representatives of the City's police department on what Romero describes as the department's "forensic machine" at the request of City Manager Wilson.[1]  (Doc. 33, at 12).  Romero also alleges that Richardson informed Romero that Wilson had instructed Richardson to "find something on Romero."  (*Id*.).  The next day, the City Council convened in executive session to discuss Romero's employment. It is alleged that no action was taken at that time.  On October 3, 2011, Romero notified City Attorney Anderson that he wished to return to work and would need access to his office and computer.  On October 7, 2011, Anderson obtained "sworn testimony" from Richardson as to Romero's alleged disloyalty to the City.  (*Id*.).  The substance of that testimony has not been placed before the Court.

At an October 11, 2011 City Council meeting, the Council voted to pass a resolution suspending and removing Romero as CFO.  Romero alleges that, at the conclusion of the Council meeting, while still in Council chambers, City Attorney Anderson stated to the public and news media that Romero had been terminated due to his attempt to "extort" the City of Miami.  (Doc. 33, at 13).  Romero requested an administrative hearing thereafter, and another Council meeting was held on October 17, wherein a citizen inquired about Romero's termination.  Romero alleges that Mayor Ketcher responded to the citizen: "I don't think he'll be snitching to you anymore."  (Doc. 33, at 13).  Romero was formally terminated the next day.

Romero filed a claim with the Equal Employment Opportunity Commission on February 2, 2012, and a Notice of Tort Claim with the City of Miami on February 23, 2012, as required

---

[1]  It is unclear from the FAC what the exact nature of the City's "forensic machine" is, but the context in which it is used suggests that it is likely a computer designed to search for or extract data from other electronic devices.

4

under Oklahoma law.  Romero brought this litigation on June 19, 2012.  The Court entered an

order (Doc. 32) on March 28, 2013 permitting Romero to file his First Amended Complaint

(Doc. 33).  OMUSA seeks dismissal of Romero's claims against it, arguing that Romero has not

exhausted his administrative remedies with respect to OMUSA as required under Oklahoma law

(*see* Doc. 36).  Defendants Ketcher, Schultz, Trussler, Atkinson, Dalgarn, Anderson, Wilson,

Long, Wells, and Hill (collectively, the "Individual Defendants") seek dismissal of Counts II, V,

VI, VII, VIII, IX, and X against them (*see* Doc. 38), pursuant to Fed. R. Civ. P. 12(b)(6).[2]

### STANDARDS

In considering a Rule 12(b)(6) dismissal motion, a court must determine whether the

plaintiff has stated a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  The

Federal Rules of Civil Procedure require "a short and plain statement of the claim to show that

the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint must provide "more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action."  *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The standard does "not require a

heightened fact pleading of specifics, but only enough facts to state a claim to relief that is

plausible on its face," and the factual allegations "must be enough to raise a right to relief above

the speculative level."  *Id*. at 555-56, 570 (citations omitted).  "Asking for plausible grounds . . .

---

[2]  On April 30, 2013, Romero filed a stipulation of dismissal (Doc. 41), which dismissed without prejudice the following claims: (1) invasion of privacy against the City and Individual Defendants in their official capacity (Count VI); (2) intentional infliction of emotional distress against the City and the Individual Defendants in their official capacity (Count IX); (3) defamation against the City and the Individual  Defendants in their official capacity (Count X); and (4) wrongful discharge against the Individual Defendants in their individual capacity (Count XI).  What remains of the claims addressed in the joint stipulation are Romero's claim for invasion of privacy against the Individual Defendants in their individual capacity; intentional infliction of emotional distress against the Individual Defendants in their individual capacity; defamation against Ketcher and Anderson in their individual capacity; and wrongful discharge claim against the City.

does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id*. at 556. "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 562.

*Twombly* articulated the pleading standard for all civil actions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). For the purpose of making the dismissal determination, a court must accept all the well-pleaded factual allegations of the complaint as true, even if doubtful, and must construe the allegations in the light most favorable to the claimant. *See Twombly*, 550 U.S. at 555; *Alvarado v. KOB–TV, L.L.C*., 493 F.3d 1210, 1215 (10th Cir. 2007).

DISCUSSION

## I.   OMUSA's Motion to Dismiss (Doc. 36)

As noted, OMUSA seeks dismissal of Romero's claims against it as a result of Romero's alleged failure to exhaust his administrative remedies under the Oklahoma Governmental Tort Claims Act ("GTCA"), Okla. Stat. tit. 51, § 151 *et seq*. Romero's response points out that his claims against OMUSA are brought pursuant to 42 U.S.C. § 1983, not state tort law, and as such he was not required to comply with the GTCA.[3]

The GTCA does require that political subdivisions of the State of Oklahoma be given notice of tort claims as a prerequisite to bringing a lawsuit. *See* Okla. Stat. tit. 51, § 156. But the Supreme Court has stated that "[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 cannot be immunized by state law." *Howlett ex rel. Howlett v.*

---

[3]  The Court notes that OMUSA did not file a reply brief responsive to this argument.

*Rose*, 496 U.S. 356, 376–77 (1990) (quoting *Martinez v. California,* 444 U.S. 277, 284 n. 8 (1980)).   The Tenth Circuit has very plainly held this statement to mean that "[a] § 1983 claim may be available, even though a state remedy is foreclosed by the Oklahoma Governmental Tort Claims Act." *Tiemann v. Tul-Ctr., Inc*., 18 F.3d 851, 853 (10th Cir. 1994); *see also Phillips v. Wiseman*, 857 P.2d 50, 52 (Okla.1993) ("[T]he [Oklahoma] Governmental Tort Claims Act and 42 U.S.C. § 1983 provide a 'double-barreled system,' and ... escaping liability under one does not necessarily mean that a party also escapes liability under the other.").   Indeed, a cursory review of prior rulings from this Court would have demonstrated to OMUSA that Romero's § 1983 was not foreclosed under the GTCA.  *See, e.g., Poore v. Glanz*, 11-CV-0797-JED-TLW, 2012 WL 1536933 (N.D. Okla. Apr. 30, 2012) ("plaintiff's lack of compliance with the notice requirements of the GTCA is not a defense to a § 1983 claim.").[4]

OMUSA's Motion to Dismiss (Doc. 36) is therefore denied.

## II.     Individual Defendants' Motion to Dismiss (Doc. 38)

The Individual Defendants seek dismissal of the following Counts in the FAC: II (§ 1983 Fourth and Fourteenth Amendment violation – individual capacity), V (injunctive relief pursuant to § 1983), VI (invasion of privacy), VII (negligent drug and alcohol testing), VIII (negligent permitting and/or failing to prevent tortious conduct of MESO and OMUSA), IX (intentional infliction of emotional distress), and X (defamation by slander).

### A.  Section 1983 (Counts II and V)

---

[4]   As the Court noted, a cursory review of applicable law would have revealed that OMUSA's position lacked any merit.  Moreover, OMUSA did not cite this contrary authority, let alone distinguish it.  *See* Okla. R. Prof. Cond. 3.3(a)(2).  At a minimum, OMUSA should have withdrawn its motion to dismiss upon reviewing the authorities cited in plaintiff's response brief. Instead, the Court's time was diverted to adjudicating a frivolous motion.

The Individual Defendants seek dismissal of the § 1983 claims alleged against them in their individual capacity based upon three distinct arguments: 1) the § 1983 claims against the Individual Defendants should be dismissed because Romero has failed to sufficiently allege the personal involvement of any of them in the allegedly unlawful drug and alcohol testing; 2) the Individual Defendants are all entitled to legislative immunity in connection with the facts alleged; and 3) defendant Anderson is entitled to qualified immunity to the extent Romero's claim is based upon legal advice provided by Anderson to the City.

### i.  Personal Involvement

Section 1983 provides a claim for relief against state actors for violation of a plaintiff's federal rights.  *Becker v. Kroll*, 494 F.3d 904, 914 (10th Cir. 2007).  To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under color of state law.  *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Anderson v. Suiters*, 499 F.3d 1228, 1232-33 (10th Cir. 2007).  In the case of a municipal entity, the "under color of state law" element requires that the constitutional deprivation occurred pursuant to official policy or custom.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).  A municipal entity may be held liable for an act it has officially sanctioned, or for the actions of an official with final policymaking authority.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482-83 (1986); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127-28 (1988).  A plaintiff "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (quoting *Board of County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404

(1997)).  A claim against a state actor in his or her official capacity "is essentially another way of pleading an action against the county or municipality", and is analyzed under the standard applicable to § 1983 claims against municipalities or counties.  *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).

Romero's § 1983 claims against the Individual Defendants in their individual capacity are premised upon the concept of supervisory liability.  To establish a claim of supervisory liability under § 1983, a plaintiff must plead and ultimately prove that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."  *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).  These elements are not "distinct analytical prongs, never to be intertwined." *Id*. at 1199 n.8.  In *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404-05 (1997), the Supreme Court discussed a situation like that alleged in this case where a municipal policy is facially in violation of federal law:

> Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself "contains no state-of-mind requirement independent of that necessary to state a violation" of the underlying federal right. *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986).  In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

(Emphasis in original).  In discussing the three elements of supervisory liability in *Dodds v. Richardson*, the Tenth Circuit cited with approval its prior decision in *Barney v. Pulsipher*, 143

F.3d 1299, 1307 (10th Cir. 1998) and the Supreme Court's decision in *Brown* (quoted above), stating that "when an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." *Dodds*, 614 F.3d at 1199 n.8.  The *Dodds* court further noted that "the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law." *Id*.  Stated differently, *Dodds* says that, where a plaintiff alleges that a municipal policy violates federal law on its face, state of mind and causation are essentially established if it is shown that the supervisor "promulgated, created, implemented or possessed responsibility" for the policy's continued operation.

Viewing the allegations in the light most favorable to the non-movant, Romero has adequately alleged personal involvement on the part of the Individual Defendants sufficient to satisfy the pleading requirements of a supervisory liability § 1983 claim.  Here, Romero alleges that the City's official drug and alcohol testing policy itself violates federal law by permitting the City to test any City employee without individualized suspicion regardless of whether the employee works in a safety or security sensitive position.  Romero also alleges that each of the Individual Defendants, all of whom are City officials, had a role in promulgating, creating, or implementing the policy, or possessed responsibility for the policy's continued operation. Romero's FAC also states that the City had prior knowledge of the illegality of the policy. Based upon the allegations in the FAC and the reasonable inferences drawn therefrom, it is plausible that each of the Individual Defendants possessed some degree of responsibility for the continued operation of the City's policy.  Under *Dodds*, this is sufficient to show that the Individual Defendants were personally involved in the alleged constitutional violation and

resulting harm, and that they acted with the requisite state of mind.   As such, Romero's allegations are sufficient to survive dismissal.

### ii.   Legislative Immunity

The Individual Defendants seek dismissal of Romero's § 1983 individual capacity claims on the basis that they are entitled to legislative immunity with respect to claims arising from the drug and alcohol testing policy and the decision to terminate Romero's employment.   Romero argues that both decisions are administrative in nature, not legislative, making legislative immunity inapplicable.

Like federal, state and regional legislators, local legislators are entitled to absolute immunity from civil liability under § 1983 for their legislative activities.  *Bogan v. Scott-Harris,* 523 U.S. 44, 44 (1998).   Absolute immunity attaches to all actions taken "in the sphere of legitimate legislative activity."  *Tenney v. Brandhove,* 341 U.S. 367, 376 (1951).   "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."  *Bogan,* 523 U.S. at 54.   Not all actions taken at a legislative meeting by a local legislator are legislative for purposes of immunity.  *Kamplain v. Curry County Bd. of Comm'rs,* 159 F.3d 1248, 1251 (10th Cir. 1998).   An act is legislative for absolute immunity purposes when it concern[s] the enactment or promulgation of public policy.  *Id.* at 1252.  Legislators' employment decisions, by contrast, are merely administrative.  *Id.* (citing a Pennsylvania case holding that a municipality's employment decisions are essentially administrative in nature); *Bogan,* 523 U.S. at 56 (holding that the "termination of a [government] position, *unlike the hiring or firing of a particular employee,*" constituted a legislative action) (italics added).

The Individual Defendants are not entitled to legislative immunity.   While they argue that the decision to terminate Romero was based on public policy, that decision is administrative, and

by no means legislative in nature.  As the Tenth Circuit noted in *Kamplain*, the act at issue must concern *enactment or promulgation* of public policy for it to be considered legislative.  The final resolution terminating Romero's employment did not enact or promulgate public policy, it simply ended his employment.  The City's drug and alcohol testing policy is likewise administrative.  The policy relates only to City employees and is inherently administrative in nature.  Accordingly, the Individual Defendants are not entitled to legislative immunity.

### iii.   Qualified Immunity as to Defendant Anderson

The Individual Defendants argue that City Attorney Anderson is entitled to qualified immunity.  Qualified immunity provides public officials immunity from suit under certain circumstances.  *Serna v. Colorado Dept. of Corrections,* 455 F.3d 1146, 1150 (10th Cir. 2006). The Tenth Circuit applies a two-step analysis to determine if a defendant is entitled to qualified immunity.   First, a plaintiff must allege that the defendant's actions violated a specific constitutional right and, if the plaintiff has alleged a constitutional violation, the plaintiff must show that the constitutional right was clearly established when the conduct occurred.  *Toevs. v. Reid,* 685 F.3d 903, 909 (10th Cir. 2012).   A court has the discretion to consider the steps in whatever order is appropriate under the circumstances.  *Id.* at 910 (citing *Pearson v. Callahan,* 555 U.S. 223 (2009)).

The Individual Defendants do not challenge Romero's allegation that a constitutional right was violated.  Instead, they argue that Anderson is entitled to qualified immunity because there is no clearly established law which prohibits a city attorney from providing advice to a municipality regarding the legality of a random drug testing policy.  This argument, however, mischaracterizes Romero's claim.  As discussed in section II(A)(i), *supra*, Romero claims that Anderson is liable in his individual capacity as a supervisor who, among others, was in one way

12

or another responsible for the continued operation of an unlawful policy.  Romero's alleged harm stems from the unlawful drug and alcohol screening, not the provision of Anderson's legal advice to the City.  Romero seeks to hold Anderson liable in his individual capacity as City Attorney based on the theory that his legal advice played a role in the City's continued policy permitting the unlawful drug and alcohol screening.  As such, the relevant inquiry is whether the alleged constitutional right—to be free from an allegedly unlawful search and seizure vis-à-vis drug and alcohol testing—was clearly established.

Law is considered clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003) (citing *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002)).  "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id*. (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Here, Romero alleges that the Supreme Court's decision in *Chandler v. Miller*, 520 U.S. 305 (1997) renders the right at issue clearly established.  The Court agrees.

In *Chandler*, the Court held that a suspicionless drug test of candidates for public office was an unconstitutional search in the absence of a special need, such as public safety.  *Id*. at 323 ("But where, as in this case, public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged."); *see also 19 Solid Waste Dep't Mechanics v. City of Albuquerque*, 156 F.3d 1068, 1074 (10th Cir. 1998) (discussing special need suspicionless drug testing at length).  Romero has alleged that he was drug tested without individualized suspicion and that the City lacked a special need, such as

safety or security, to do so.  The right alleged to have been violated has been clearly established.

As a city attorney, a reasonable person in Anderson's position would have known that the City's

policy, as applied to Romero, was unconstitutional.  Defendant Anderson is therefore not entitled

to qualified immunity at this stage of the proceedings.

### B.  Invasion of Privacy (Count VI)

Romero alleges a claim against the Individual Defendants under Oklahoma invasion of

privacy law for intrusion upon his seclusion.    To state a claim for intrusion upon seclusion,

Romero must allege "(a) a nonconsensual intrusion (b) which was highly offensive to a

reasonable person."  *Gilmore v. Enogex, Inc*., 878 P.2d 360, 366 (Okla. 1994).  The Individual

Defendants argue that this claim fails as a matter of law because any intrusion was carried out by

MESO/OMUSA and because the drug and alcohol test was not highly offensive under Oklahoma

law.

As to the defendants' first contention, the Court has already found that, at this stage of the

litigation, Romero has adequately alleged the personal involvement of the Individual Defendants

in the drug and alcohol testing at issue.  As such, the Court finds that he has likewise sufficiently

alleged that the Individual Defendants participated in a nonconsensual intrusion.

With respect to their second contention, the defendants rely upon *Gilmore*, *supra*, where

the Oklahoma Supreme Court held that a common law intrusion upon seclusion claim based

upon a suspicionless drug test failed.  In *Gilmore*, the drug test was performed by a private

employer, which, as the court noted, has a legitimate interest in ensuring a drug-free workplace

and is not subject to the same standards as a public employer.  *Id*. at 366-67.  As the court noted,

"when Gilmore's privacy concerns are balanced against Enogex' legitimate interest in providing a

drug-free workplace, his invasion-of-privacy claim fails to meet the law's highly-offensive-to-a-reasonable-person test." *Id*. (italics omitted).

The Court finds that the facts alleged by Romero differ significantly enough from *Gilmore* that the case does not mandate dismissal of his claim.  Here, the City's interests are alleged to have lacked the legitimacy found in *Gilmore* in light of controlling Fourth Amendment law.  That is, Romero's FAC asserts that the City had no right to administer the test to him.  The facts alleged here, if true, could well amount to unconstitutional actions by a state entity, *see 19 Solid Waste Dep't Mechanics*, 156 F.3d at 1074, whereas *Gilmore* did not involve unconstitutional actions or a public employer.  Viewing Romero's allegations in the light most favorable to him, the Court finds that a reasonable finder of fact could determine that the drug and alcohol test at issue would be highly offensive to a reasonable person.  Romero's invasion of privacy claim is therefore not subject to dismissal.

### C.  Negligence (Counts VII and VIII)

Romero's FAC alleges claims for negligent drug and alcohol testing (Count VII) and negligent permitting and/or failing to prevent tortious conduct of MESO and OMUSA (Count VIII).  The Individual Defendants seek dismissal of both negligence claims for the same two reasons.  First, they argue that under the GTCA, officials sued in their individual capacity are immune from suit unless they acted outside the scope of their employment or in bad faith.  Second, they argue that the claims should be dismissed because Romero bases the duty allegedly breached on Oklahoma's Standards for Workplace Drug and Alcohol Testing Act (the "SWDAT" or the "Act"), Okla. Stat. tit. 40, § 551 *et seq.*, which applies only to employers.[5]

---

[5]  The FAC mentions the SWDAT in the context of Romero's first negligence claim (Count VII), but not his second negligence claim (Count VIII).

Under the GTCA, "[a] government employee acting within the scope of employment is relieved from private (individual) liability for tortious conduct", but malicious and/or bad faith conduct is not considered within the scope of employment. *Pellegrino v. State ex rel. Cameron Univ. ex rel. Bd. of Regents of State*, 63 P.3d 535, 537 (Okla. 2003). Romero argues that his FAC demonstrates that the Individual Defendants acted in bad faith because they had prior notice from the former City Attorney that the drug and alcohol testing policy was unconstitutional but nevertheless continued the unlawful policy. The Court finds that the allegations pled in Romero's FAC raise an inference of bad faith sufficient to withstand dismissal pursuant to the GTCA.

As to the second issue, the Individual Defendants are correct that the SWDAT does not provide a cause of action against individual employees or officers of an employer under the circumstances presented here. *See* Okla. Stat. tit. 40, § 552 ("'Public employer' means the State of Oklahoma or any political subdivision thereof, including any department, agency, board, commission, institution, authority, public trust, municipality, county, district or instrumentalities thereof"). Romero does not dispute that the Act would not permit such a claim and states that he is not pursuing a private right of action under the SWDAT. Instead, Romero references the Act in his FAC as the standard by which the Court should ascribe a duty to the Individual Defendants under negligence principles. In other words, Romero suggests, but does not explicitly state, that he has pled a claim for negligence per se. The Individual Defendants do not appear to challenge Romero's use of the SWDAT for purposes of a negligence per se claim, and instead argue only that the Act is inapplicable to them. Nevertheless, the Court will analyze whether the SWDAT can serve as the basis for a negligence per se claim.

"To establish negligence on the basis of a statutory violation the party must establish that: 1) the injury was caused by the violation; 2) the injury was of a type intended to be prevented by the statute; and 3) the injured party was of the class meant to be protected by the statute." *Busby v. Quail Creek Golf and Country Club*, 885 P.2d 1326 (Okla. 1994).  Here, Romero alleges that the Individual Defendants participated in the violation of the SWDAT and that the violation caused him injury.  This alleged injury—being subjected to an unlawful drug and alcohol test— is the very type of injury the statute is intended to prevent.  *See, e.g., Estes v. ConocoPhillips Co.*, 184 P.3d 518 (Okla. 2008) (purpose behind SWDAT is to create standards for employer drug and alcohol testing so both employees and employers can be assured of due process). Romero is also part of the class meant to be protected by the Act.  *See Leisure Vill. Operating LLC v. Prof'l Clinical Lab.*, 781 F. Supp. 2d 1205, 1220 (N.D. Okla. 2011) ("the Testing Act was intended to protect employees").  Accordingly, Romero is not prohibited from utilizing the SWDAT as the basis for a negligence per se claim, and the Individual Defendants' motion to dismiss is denied as to Counts VII and VIII.

**D.  Intentional Infliction of Emotional Distress (Count IX)**

The Individual Defendants also seek dismissal of Romero's intentional infliction of emotional distress ("IIED") claim for two reasons:  he has not adequately alleged their personal involvement in causing his alleged injury and the conduct alleged is not sufficiently extreme to support such a claim.  The Court has already determined that Romero has sufficiently pled personal involvement on the part of the Individual Defendants and will therefore take up only the defendants' second contention.

In Oklahoma, a claim for IIED is governed by the narrow standards laid out in the Restatement Second of Torts, § 46.  *See Gaylord Entertainment Co. v. Thompson,* 958 P.2d 128,

149 (Okla. 1998).  *In Breeden v. League Services Corp.,* 575 P.2d 1374 (Okla. 1978), the

Oklahoma Supreme Court explained:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

*Id.* at 1376.  To state a claim, a plaintiff must allege that "(1) the defendant acted intentionally or

recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct

caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe."

*Schovanec v. Archdiocese of Oklahoma City,* 188 P.3d 158, 175 (Okla.2008) (quoting *Computer

Publications, Inc. v. Welton,* 49 P.3d 732, 735 (Okla.2002)).  Under Oklahoma law, the trial

court must assume a "gatekeeper role" and make an initial determination that the defendant's

conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the

Restatement § 46 standards."  *Trentadue v. United States,* 397 F.3d 840, 856 n.7 (10th Cir. 2005)

(applying Oklahoma law).  If reasonable persons could reach differing conclusions in the

assessment of the disputed facts, the Court should submit the claim to the jury to determine

whether the defendant's conduct could result in liability.  *Id.*

The Court finds that the conduct alleged on the part of the Individual Defendants is not

extreme and outrageous.  While the Court has found in the context of Romero's intrusion upon

seclusion claim that the defendants' conduct could be considered highly offensive to a

reasonable person, this standard is not as onerous as that necessary to support an IIED claim.

The level of offense necessary to prove an IIED claim—that the conduct be "so extreme in

degree, as to go beyond all possible bounds of decency"—constitutes, by its own terms, a very

high burden.  Conduct could reasonably be viewed as highly offensive while still not rising to the level of extreme and outrageous, as is the case here.  Romero alleges that the Individual Defendants participated in implementing and/or continuing a policy which ultimately resulted in the violation of his constitutional rights.  He further alleges that he was retaliated against when he raised concerns about his rights.  He asserts that employees were instructed not to speak to him, an inquiry was made into his performance, the locks were changed on his office, and he was ultimately terminated and allegedly defamed by being called an extortionist and snitch.  Viewing these allegations in their totality, the conduct alleged on the part of the Individual Defendants is not extreme and outrageous.  Indeed, this type of conduct in an employment setting will rarely be viewed as extreme and outrageous.  *See, e.g.*, *Gabler v. Holder & Smith, Inc.,* 11 P.3d 1269 (Okla. Civ. App. 2000) (noting that workplace harassment rarely rises to the level of extreme and outrageous conduct); *Mirzaie v. Smith Cogeneration, Inc.,* 962 P.2d 678 (Okla. Civ. App. 1998) (employer's conduct was not extreme and outrageous when, *inter alia*, the plaintiff's manager made derogatory sexual remarks about the plaintiff, woke plaintiff up in the middle of the night to do unnecessary work, and terminated him two hours before his wedding); *Zahorsky v. Community Nat'l Bank of Alva,* 883 P.2d 198 (Okla. Civ. App. 1994) (employer not liable for intentional infliction of emotional distress when an employee forced the plaintiff to have sex with him and employer failed to fire the employee, even though the employer allegedly knew about the conduct).

Having found that Romero has failed to allege sufficiently extreme and outrageous conduct, his claim for IIED against the Individual Defendants is dismissed.

### E.  Defamation (Count X)

Romero's FAC alleges a defamation claim against the City, Mayor Ketcher and City Attorney Anderson.  He alleges that Anderson slandered him at the conclusion of the October 11, 2011 City Council meeting by publicly stating that Romero had attempted to extort the City.  He also alleges that he was slandered when Ketcher told a constituent during the October 17, 2011 City Council meeting that Romero would not be "snitching" to the constituent anymore.  (Doc. 33, at 26-27).  Defendants Ketcher and Anderson seek dismissal of Romero's defamation claim, arguing that their comments were privileged under Oklahoma law because they were made during the course of a legislative proceeding.

Oklahoma law provides that legislative privilege applies to statements made "[i]n any legislative or judicial proceeding or any other proceeding authorized by law…"  Okla. Stat. tit. 12, § 1443.1  "This privilege, more usually examined in regard to pleadings or utterances in judicial proceedings, has been called absolute."   *Burkett v. Tal*, 94 P.3d 114, 117 (Okla. Civ. App. 2004) (citing *Pryor v. Findley,* 949 P.2d 1218, 1219 (Okla. Civ. App. 1997) and *Kirschstein v. Haynes,* 788 P.2d 941 (Okla. 1990)).  Privileged statements are those "that are connected with, relevant, pertinent or material to the subject of inquiry; and such communication will in no event support an action for slander."  *Hammett v. Hunter*, 117 P.2d 511, 512 (Okla. 1941).

The allegedly defamatory statements uttered by Ketcher and Anderson were made during or at the conclusion of the October City Council meetings.  Both statements related to an issue which was one of the subjects of the meetings—Romero's suspension and removal as CFO of the City.  There are no allegations in the FAC which would demonstrate that Ketcher's and Anderson's respective statements, even if false, should not be subject to the absolute privilege

accorded to legislative proceedings.  Romero urges the Court to follow the rationale of *Kamplain v. Curry County Bd. of Comm'rs,* 159 F.3d 1248, 1251 (10th Cir. 1998), discussed *supra*, where the Tenth Circuit discussed legislative immunity in relation to § 1983 claims.  *Kamplain*, however, was not a defamation case and did not involve application of § 1443.1.  As such, *Kamplain* does not mandate that Oklahoma's absolute immunity statute should be applied differently in this situation.  Accordingly, the Court finds that Romero's defamation claim against defendants Ketcher and Anderson should be dismissed, as their statements are subject to legislative privilege.

### CONCLUSION

**IT IS THEREFORE ORDERED** that defendant OMUSA's Motion to Dismiss (Doc. 36) is **denied**.  The Individual Defendants' Motion to Dismiss (Doc. 38) is **granted in part and denied in part**.  Plaintiff's claims for intentional infliction of emotional distress and defamation are dismissed.  All other claims remain.

**IT IS FURTHER ORDERED** that OMUSA shall file its answer to Romero's Amended Complaint within 21 days of the date of this Opinion and Order.

**DATED** this 20th day of March, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE